### SCHNUETTGEN v. FRANK.

(Circuit Court of Appeals, Eighth Circuit. March 28, 1914.)

No. 4048.

SPECIFIC PERFORMANCE (§ 106*)—RIGHT TO RELIEF—CONTRACT FOR SALE OF LAND.

    Complainant's deceased husband, who by his will made her his sole devisee and legatee, in his lifetime made a parol agreement with defendant and another, who were owners of a farm of about 300 acres, for the purchase of the farm at $100 per acre. Being unable to pay the full amount, it was afterward agreed that he should purchase and pay for the 50 acres on which the buildings were situated at a valuation of $250 per

.acre, and should have the right to purchase the remainder at any time within five years at $70 per acre, having the use of the same in the meantime at the current rental. He went into possession and received a deed for the 50 acres, and a paper signed by the owners in the form of an offer to sell the remainder at the agreed price. This was written in English, which the purchaser could not speak nor read, but he was told by defendant that it was in accordance with their agreement, as it was, with the exception that it fixed no time within which the offer might be accepted. Twice during his lifetime and within a year or two, complainant's husband went to defendant, who had acquired the interest of his cotenant and desired to pay for and receive a deed for the remaining land, but was told by defendant that the option was good for five years, and finally that defendant was not obliged to make the conveyance until the expiration of that time. *Held,* that defendant was bound by his statements that the option continued for five years, that the offer therein made was accepted within that time, which gave the purchaser the equitable title to the land, and that such title descended to complainant, who was entitled to specific performance of the contract.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 342–351; Dec. Dig. § 106.*]

Appeal from the District Court of the United States for the Southern District of Iowa; Smith McPherson, Judge.

Suit in equity by Mary Frank, individually and as executrix of the will of Earnest Frank, deceased, against John Schnuettgen. Decree for complainant, and defendant appeals. Affirmed.

See, also, 187 Fed. 575.

G. W. Cullison, of Harlan, Iowa (William Gardner and Shelby Cullison, of Harlan, Iowa, on the brief), for appellant.

Charles Hutchinson, of Iowa Falls, Iowa (Jacob Sims, of Denison, Iowa, Byers & Byers, of Harlan, Iowa, and Clark, Byers & Hutchinson, of Des Moines, Iowa, on the brief), for appellee.

Before SANBORN and CARLAND, Circuit Judges, and RINER, District Judge.

RINER, District Judge. This is a suit for the specific performance of a contract for the purchase of real estate. The bill alleges in substance that in January, 1903, Earnest Frank, now deceased, the husband of appellee, entered into negotiations with the appellant and one Charlotte Gardner for the purchase and transfer to him of 295 acres of land in Shelby county, Iowa; that, in the negotiations for the sale of the land, the entire tract was figured at a valuation of $100 per acre. As a result of their negotiations, it was finally agreed that 50 acres of land, upon which the buildings and improvements were located, should be conveyed to Frank, he paying at that time the sum of $12,500, or at the rate of $250 per acre for the land conveyed, the payment to be considered as a part payment upon the whole tract; that for the remainder of the tract he was to receive a contract wherein it was to be stipulated and agreed that, if at any time within five years from the date of the contract Frank should pay a sum equal to $70 per acre for the remainder of the tract, the same should be conveyed to him, and, pending such payment, the land was to be used and occupied by Frank,

he paying rent therefor. Pursuant to the agreement and understanding of the parties, Frank paid $12,500 and received a deed for the 50 acres and the following option contract:

"To Earnest Frank: We hereby offer to sell you 90 acres, more or less, in the southeast quarter (SE¼) of section thirty-two (32), being all of said quarter section lying northwest of the Chicago, Milwaukee & St. Paul Railway Company's right of way, except 11 acres in the southwest corner thereof, (said 11 acres consisting of a ball ground and [tenants] premises and buildings adjacent thereto) for $70.00 per acre, on the following terms, to wit: You to pay us one-third cash, we to carry the balance of the purchase price for such time as may be agreeable at 4 per cent. per annum, taking first mortgage on the land to secure the same. We offer you a like option to purchase all our remaining land in said section at same price and on same terms. We further agree to lease to you, from year to year, all, or any, of our lands in said section at the prevailing rates of rent. If we place any improvements upon the above described land, after this date, the cost of such improvements shall be added to said price of $70.00 per acre.

"[Signed]    John Schnuettgen.
"Charlotte  Gardner."

"Dated January 19, 1903."

It is further alleged in the bill, and the proof shows, that in March, 1904, Frank entered into the possession of all of the lands and continued in possession and occupancy thereof up to the time of his death, and that his family have occupied the premises ever since and are now in possession thereof.

It is also alleged in the bill:

"(2) That, at the time your orator's husband paid said Schnuettgen the purchase price of the 50 acres, said Schnuettgen knew that your orator's husband understood and believed that he was purchasing the entire tract containing, as above alleged, about 300 acres of land, and that he was purchasing the land for a farm. That all the buildings and improvements on the entire tract were located on the 50 acres, and that, without the right to purchase the balance of the land in said section, the 50 acres would not have been worth to exceed $150 an acre. That neither your orator's husband nor your orator understood or could speak the English language, which fact was well known to the defendant Schnuettgen. That the contract or bond for a deed above referred to was written in English, and neither your orator, who was present at the time, nor her deceased husband could read said contract, but the said Schnuettgen stated that it contained the agreement as above, and that not until some time after its execution did your orator's husband learn that there was no time fixed in said contract when the option to take conveyance of the remainder of said land would expire, whereupon your orator, with her deceased husband, called upon the defendant Schnuettgen and told him that they were ready to take a conveyance of the remainder of said land and desired to have the transfer made at once. That in response the said Schnuettgen stated that the contract was good for five years, that it was not necessary that it should be stated in the contract, and urged your orator's husband to wait until he had harvested another crop and until money was more plentiful before taking a conveyance of the remainder of said tract, and assured your orator's husband that his contract for a conveyance of said land would be good for five years."

"(4) That on or about the spring of 1905, and within a little over a year subsequent to the execution and delivery of the contract hereinbefore referred to, your orator's husband had made arrangements to procure the money to pay for the land on the terms stated in the contract and so notified the defendant Schnuettgen, whereupon the said Schnuettgen informed your orator's husband that conveyance could not be made at that time because the land had been leased for another year, and urged and persuaded your orator's husband not to insist upon conveyance at that time, said Schnuettgen insist-

ing that, under the contract, he was not bound to accept his money until the five years agreed upon had expired. That your orator's husband, being ignorant and not being able to understand or read the English language, and not informed as to his rights, believed the said Schnuettgen, and, relying upon assurances of the said Schnuettgen that the option was good for five years, he did not further insist upon a conveyance."

It is further alleged that Earnest Frank died November 1, 1905, leaving a will, by the terms of which all his property, both real and personal, was devised and bequeathed to Maria Frank, his wife, the appellee herein, and that she duly qualified as executrix of the estate. It is also alleged that Charlotte Gardner, subsequent to these transactions, conveyed by deed all of her interest in the land to John Schnuettgen, the appellant.

This is the second appearance of this suit in this court. The first appeal was taken from a decree dismissing the bill upon a general demurrer. When the case was first here, Judge Carland, speaking for the court, said:

"In order to clear the case of any complications by reason of the joint ownership of the land in question at the time of the making of the alleged contract, it is proper to say that the defendant, Schnuettgen, could lawfully make a contract to convey land owned by himself and another, and, if subsequently he became the sole owner of the land, he should be compelled to convey the same if the case was otherwise one for specific performance."

It was then argued, as it is now, that Exhibit B, the option contract, was not a contract to convey but a mere offer which Earnest Frank never accepted. In disposing of this contention the court said:

"We think that the allegations of paragraphs Nos. 2 and 4 of the bill clearly show that Frank did accept the offer contained in Exhibit B in his lifetime and within the five-year period. It does not appear that Schnuettgen at any time objected to receiving payment in cash instead of a mortgage, but, on the contrary, it does affirmatively appear from the bill that Schnuettgen claimed that he was not obliged to receive the money for the land until the expiration of the five-year period, which he alleged was the contract whether it appeared in Exhibit B or not. We think that, in view of the allegations of the bill that Frank could not read or understand English, we must take the oral declarations of Schnuettgen as to what Exhibit B did contain as binding upon him. These allegations also render unimportant the time when Schnuettgen told Frank that Exhibit B specified five years as the time within which the offer should be accepted."

These allegations of the bill are supported by the evidence of Mrs. Frank, who testified that, the second spring after they moved on the land, Mr. Frank told Schnuettgen in her presence that he wanted to close the matter up and take the land; that Mr. Schnuettgen said he should wait, as he still had three years. Emile Frank, who was present at the conversation, testified:

"My father told him he was ready to take that land now and pay him the $70 per acre, and he said, 'Oh, you better wait a few years yet; you got three years' time yet.'"

There is other evidence in the record tending to corroborate the testimony of these witnesses; indeed, they are corroborated by appellant himself, as is shown by the following excerpt from his testimony:

"I knew that Mr. Frank was a farmer and had a large family, and that they were all at home and worked on the farm, and that, when I went out to

Nebraska and talked with Mr. Frank, he told me that he had to have a farm large enough to furnish work for the boys, and that he wanted a farm big enough so that they could all work at home. He wrote to me that he wanted about 200 acres plowland and some pasture land. That was about all the plowland there was on this whole farm. When I was there at Mr. Frank's farm and first figured, Mr. Frank's last understanding with me was that he was to take the 50 acres at an estimate of $250 an acre and was to have a contract for the balance of the land at $70 an acre, and that the contract was to run five years, and in the meantime he was to have the use of it at the usual rental that was paid in that neighborhood; that was the preliminary talk. I talked with Mr. Frank and his family in German. Mr. Frank and his wife were together a good deal on their business deals. When Frank said he wanted a chance on this land for five years, he called it an option. He wanted the right. Option means right in German. I don't know that Earnest Frank didn't know the meaning of the word 'option.' I know it in German; it is simply the right to sell. Mr. Frank didn't say not only that he must have the right, the 'recht' as he spoke the word, the 'recht must haben,' but he also said contract, that he 'must a contract haben.'"

He further testifies that he did not know how long he thought the option was to continue, and that he told Mrs. Frank when Frank died the contract died with him.

He further testified that the deed and option were prepared, signed, and delivered to Frank without any further talk as to the five-year term; he simply telling Frank that it was their agreement. Nowhere in his evidence does he dispute the testimony of the various witnesses as to his statements made during Frank's lifetime in regard to the terms of the contract. The evidence, taken altogether, shows beyond doubt that the contract was understood by Schnuettgen and by Frank and his wife to be an option contract for the term of five years, and with that understanding Frank entered into possession of the premises and paid the $12,500. As the evidence shows that Frank accepted the offer to sell during his lifetime and within the five-year period, he became the equitable owner of the land; and as was said when the case was first here:

"This equitable ownership descended to his wife under his will, and she may now invoke the powers of a court of equity to have the contract enforced. Rutherford v. Green, 37 N. C. 121; Dougherty's Adm'rs v. Goggin, 1 J. J. Marsh. (Ky.) 373; Godfrey v. Dwinell, 40 Me. 94; Dawson v. Clay's Heirs, 1 J. J. Marsh. (Ky.) 165; House v. Dexter, 9 Mich. 246; Collins v. Vandever, 1 Iowa, 573; Laverty v. Hall's Adm'rs, 19 Iowa, 526; Putnam v. Tinkler, 83 Mich. 628, 47 N. W. 687."

It is also urged that the contract was void for want of mutuality. The same question was raised at the former hearing, and this court accepted, as a fair statement of the true rule, the language of the Supreme Court of Wisconsin in the case of Peterson v. Chase, 115 Wis. 241, 91 N. W. 688. In that case the Supreme Court of Wisconsin had before it a contract similar to the one now under consideration, and, in disposing of this objection to it, said:

"The principal objection urged by appellant is that the contract was not mutual and will therefore not be specifically enforced. To this conclusion, as a general rule, many authorities can be cited, but the exceptions or apparent exceptions are * * * so numerous, and so important, that the decided cases illustrating them now constitute an almost equal volume of authority. Among these exceptions are optional agreements to sell land at a specified price and terms within a fixed time, especially if supported by a good and.

executed consideration. Upon fundamental principles there seems to be no difficulty in supporting the validity of such agreements. In their ultimate analysis they are but offers to sell, and, if accepted before withdrawal, become binding, because thereupon the other party becomes bound, and a complete contract arises, entirely mutual. Nor, on principle, is there any reason why the seller, for a good consideration, may not bind himself that the offer shall not be withdrawn before a specified date. A so-called time option to purchase contains only the above elements, namely, an offer to sell, accompanied by agreement to hold such offer open. Beach, Mod. Cont. par. 886 et seq.; Waterman, Spec. Perf. par. 200; Willard v. Tayloe, 8 Wall. 557, 19 L. Ed. 501; Brown v. Slee. 103 U. S. 828, 26 L. Ed. 618; Guyer v. Warren, 175 Ill. 328, 51 N. E. 580; Cheney v. Cook, 7 Wis. 413; Wall v. M., St. P. & S. S. M. R. Co., 86 Wis. 48, 56 N. W. 367."

Finding no error in the record, the decree is affirmed.